**MONTGOMERY COUNTY, Appellant,**

v.

**Helen S. GROUNDS, Individually and as Representative of the Estate of Billy Joe Grounds, Deceased, Appellee.**

No. 09–92–042 CV.

Court of Appeals of Texas, Beaumont.

July 22, 1993.

Michael Phillips, Michael Phillips & Associates, Houston, for appellant.

K. Michael Mayes, Mark D. Haas, Law Office of K. Michael Mayes, Conroe, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This first impression workers' compensation appeal comes to us from the 359th Judicial District Court of Montgomery County, Texas, Judge James H. Keeshan, presiding. The jury returned a verdict favoring the widow of the deceased employee, who died from a heart attack at his home.

The primary question before this Court is whether Bill Grounds' death resulted from a compensable injury received by him while in the course and scope of his employment with the Montgomery County Sheriff's Depart-

ment, which would entitle Mrs. Grounds to widow's benefits under the Workers' Compensation Act.

Factually, Bill Grounds died on December 14, 1988 while at his home. Bill Grounds and two other deputies, James McDougal and Paul McQueen, were indicted by a Montgomery County Grand Jury on December 8, 1988, regarding alteration of sheriff department records.

It is necessary that we recite certain facts pertaining to the ultimate return of indictments by the Montgomery County Grand Jury. In 1986, one James Tiny Dehart, was involved in a one-vehicle accident which resulted in Dehart's death. This accident was investigated by Deputy McDougal. Due to the fact that the accident involved a fatality, Justice of the Peace James Dinkins was called to the scene.

Deputy McDougal made his investigation which resulted in a written automobile accident/offense report. The report stated that alcohol was a contributing factor to the accident and that a blood sample was taken from decedent, Dehart. This blood sample was taken at a funeral home and according to the testimony of the funeral home director, Deputy McDougal drew the blood sample himself. Deputy McDougal denied so doing and testified that the director of the funeral home took the blood sample. Certainly, if Deputy McDougal drew the blood such would have been unauthorized.

Later, Deputy McDougal was instructed by Captain McQueen of the Sheriff's Department to discard the blood sample. Testimony reveals that instead of following McQueen's directions, McDougal poured some of the blood into another vial and sent same to the Department of Public Safety for testing.

Sergeant Bayer of the Sheriff's Department, not realizing that McDougal had failed to follow instructions, changed McDougal's accident report to state that a blood sample was not taken since it was "contaminated."

Testimony at trial below confirmed that Sheriff Joe Corley had "instructed" his employees to take care of the Dehart accident

report to save the Dehart family embarrassment.

According to the record it was not uncommon for Sheriff Corley to require alterations or changes in offense/accident reports. Mr. Paul McQueen was a captain with the Montgomery County Sheriff's Department, both prior to and at the time of Bill Grounds' death. Mr. McQueen testified that it was common practice for Sheriff Corley to instruct the dismissal of traffic tickets. On one occasion Sheriff Corley instructed Mr. McQueen to take care of a D.W.I. charge so that it would not be prosecuted.

Suffice it to say that the record is replete with testimony that it was a custom of Sheriff Joe Corley to alter or change offense/accident reports. The record reveals no grand jury indictment of Sheriff Corley.

Regarding the Dehart accident report, Mr. John Orr, then investigator/sergeant with the Montgomery County Sheriff's Department, testified that Sheriff Joe Corley stated, "this deal with Tiny, . . . we really need to get. it taken care of and save the embarrassment of the family." Those present at the time of this statement were Chief Grounds, Captain Paul McQueen, Ross Bayer and Sergeant John Orr. We recite the following testimony from Mr. Orr:

Q. What, now, you say he was standing there behind Bill Grounds, put his hand on him or on his chair or something. Who responded to it?

A. Well, it kind of stuck with me, because usually when decisions like that were made, I'm not around. So, the Chief just kind of looked at the Captain, and the Captain kind of looked at Ross and Ross set there and went, "hey, I'll take care of it." And that's how it went down.

Q. Was there any question in your mind, sir, that Sheriff Joe Corley is the one that said what you just said?

A. There is no doubt in my mind he was the man that ordered it.

Q. Do you know whether or not, up until that point in time, that Chief Deputy Bill Grounds knew anything about this report?

A. No, sir.

Q. Did Bill Grounds say anything in response to it?

A. No, sir. He just smiled and looked at the captain.

From the record this cited portion reflects Chief Grounds' involvement in the alteration of the Dehart accident report.

The record in this lengthy jury trial makes it clearly obvious that Chief Grounds had no direct involvement in making the alterations. Matters relating to the alteration of the Dehart accident report subsequently became the subject of a Montgomery County Grand Jury investigation. Chief Grounds was advised by the district attorney's office that he, Chief Grounds, had nothing to worry about. Evidence reveals that Chief Grounds relied upon this representation thereby going about his daily business without fear, worry, or concern about being indicted. The evidence is clear that prior to December 7, 1988, Chief Grounds was in good health and was fully able and capable of performing all his duties as Chief Deputy to Sheriff Corley. Chief Grounds had previously had heart surgery in 1981, but had apparently fully recovered from same.

On December 7, 1988, Sheriff Corley attended a meeting with an assistant district attorney regarding the Montgomery County Grand Jury investigation of the Dehart matter. Sheriff Corley had instructed Chief Grounds to wait at the office and that he, Sheriff Corley, would return to the office and inform Chief Grounds of the grand jury status. Sheriff Corley was known to be a boss that would not tell a person bad news to their face. Chief Grounds awaited the return of Sheriff Corley, however, Sheriff Corley did not return. Sheriff Corley instructed his secretary to inform Chief Grounds that he would not be returning to the office to talk to him. It was at this moment that Chief Grounds knew that the Sheriff's failure to return could mean nothing but bad news. It was at this moment that Chief Grounds experienced observable emotional and traumatizing shock. Mr. Charles Lowry, then an employee for the Montgomery County Sheriff's Department, testified to the following:

Q. But when the secretary came in, you said you had an indication that something bad was going to happen, or not?

A. When she said the Sheriff will call you at home tonight, it was obvious to all concerned that the news was not good. If the Sheriff had had good news, he would have come back to the department and told the Chief Deputy about it. To have the Chief Deputy and the Patrol Captain and the Traffic Sergeant indicted, is a direct reflection on the Sheriff, tremendous repercussions, politically and otherwise, and as such is as bad news to the Sheriff as anyone.

Q. From your indications then from the office after Margaret came down, it was your understanding that the Sheriff was going to call Mr. Grounds at his home at night?

A. Yes, sir.

Q. Do you know if it was going to be that evening or the next evening?

A. She said, the Sheriff will call you at home this evening.

Q. And do you recall approximately when in the evening on December 7th that the secretary came in; just an idea?

A. It was late in the evening. It may have even—I am going to say between 5:00 and 6:00 o'clock. That's the best I can pin it down. It just seems to me, upon reflection, that the workday was either over or just about to be over.

.    .    .    .    .

Q. Immediately after she told Billy Joe Grounds what she told him, did you have an opportunity to · observe Billy Joe Grounds as far as his demeanor, the way he looked at that time?

A. Yes, I did.

Q. Could you please tell us and tell the jury what you observed as far as his appearance was concerned?

A. He turned as pale as a sheet. He had a stricken look on his face, and just kind of sagged down in his chair. It was the only time I believe I can ever recall that he was actually speechless.

Q. Can you tell us whether or not he appeared that way, that change, immedi-ately after she told him, or did some period of time pass after she told him, that he appeared that way?

A. Upon her telling him that the Sheriff would call him at home that evening, is when he became depressed.

Q. The first thing you mentioned after she told him, was you looked at him and said he was as pale as a sheet?

A. Yes.

Q. Does that mean that he was white or could you describe that for us?

A. Just pale, just white, visibly stunned. I had never seen a stricken look like that on his face. We all knew that it was bad news. We were all stunned. The Sheriff, like anyone else, we as individuals never miss an opportunity to tell anybody good news, because we like the reactions of folks that get good news. None of us like to deliver bad news, but that was probably about the worst news he could receive at that time.

Q. Before that time on December 7, 1988, and knowing Billy Joe Grounds before that time, had you ever seen him turn pale as a sheet before?

A. I had never seen him react in that way.

Q. Have you ever seen him stricken? Had you ever seen him in that condition before that time on December 7, 1988?

A. As a result of an event or—

Q. Yes, sir.

A. No, I can't. I can't say that I did.

Q. And you also said he sagged in his seat immediately—

A. Just kind of—he was sitting much like I am, and when she broke the news, it was kind of like that. He didn't look at anyone, didn't look at anything, and then just eventually recovered, and shortly thereafter everybody called it an evening because obviously he needed to get home and see what the Sheriff had to say.

Q. You said that he also was speechless; it's the first time you had ever seen him speechless?

A. Yes.

Q. Was he usually a talkative person, or how can you describe that?

A. I would say, yes, he was a talkative person. As I said, he would spend hours with people, straighten them out, both personally and professionally. When you are a Chief Deputy, you take on the personal problems of your people as well as professionally, and the high stress occupation that policing is, a high rate of divorce and suicide, and a lot of different things, and so consequently the Chief always had a deal; he said you treat them like you would your kids. He said you hug them when they are good and spank them when they are bad.

Q. Do you know how long he didn't say anything after the secretary told him that? You said he was speechless. Do you know what period of time passed before he said anything?

A. He didn't immediately say anything. I believe Paul McQueen said something and Margaret responded to it, and then he got back up and he was trying to address himself to the situation, and after that, we kind of speculated perhaps what it was, anything from the Sheriff perhaps had some business to take care of and had to go immediately home, and hoping against hope as all of us were, that everything was okay, and he never recovered. If anything, it was an air of forced gayety [sic], both that night and the following evening.

Q. Did he express concern to you after the secretary told him this; in other words, did Billy Joe Ground [sic] say anything to you, Mr. Lowry, about being concerned, being worried, anxious, after this happened?

A. I walked him out to his car and he didn't say anything, and we got to the car and he opened the door and just kind of looked at me and said, it doesn't look good, does it; and I said, no, it doesn't, and so he said, I'll call you tonight after I talk with the Sheriff.

Q. How long were you and these other individuals in the office after the secretary brought this news, before you de- cided to go out in the parking lot with Mr. Grounds?

A. It wasn't long. He didn't stay then maybe more than 5 or 10 minutes. He was of course anxious to get on home.

Q. Mr. Lowry, I know you are not a doctor and I know you are not a health care provider, that type of thing, but from your observance of Billy Joe Grounds after this news broke that evening, December 7, 1988, when you observed him and observed his demeanor and the pale sheet, that type of thing, can you tell us whether or not it appeared to you that he was physically ill as a result of this news that was given to him?

A. I thought he was devastated. The last several months that I had served in the Marines before my discharge from active duty, I was present when news had to be broken to people about their sons being either killed or wounded, and in all the years that I spent as a policeman I had to deliver such messages, either to parents about sons or daughters being killed or injured and what have you, and his reaction was no less severe as theirs.

Q. If you know, did he appear to be physically ill after this news, based on your observation of the pale as a sheet, stricken, that type of thing, or do you know?

A. I felt he was, yes.

Q. When you walked him out to the parking lot, did anybody else walk with you out there?

A. Just myself and him.

Q. When you were walking out with him, where was the parking lot situated; right outside the building or how far away?

A. Just right outside the building.

Q. Is there any particular reason you walked with him; whether it be for comfort, encouraging words, just talking? For what reason?

A. That's essentially it. I just kind of felt like he needed somebody then, and I walked out with him to respond to anything he had to say, and he didn't have

anything to say, other than he said it doesn't look good.

Q. From the time after he heard this news, and which you observed his physical demeanor, did it ever appear to you that he recovered from that so called devastation from the time he first heard the news until the time that you put him in the car—ya'll went to the car in the parking lot?

A. Well, he was able to talk and respond to questions and things of that nature. He just moved very slowly and walked out of the building.

Q. When you say he moved very slowly out in the parking lot, what was his posture like? Was he walking straight up and down or was he—

A. No; he wasn't walking straight up and down. He was obviously quite deep in thought and had to have been, I don't know, trying to figure what am I going to do, what am I going to say, what has the Sheriff got to say to me, what am I going to say to him, what does this mean, am I out of a job, my career is finished, anything that would be going through anybody's mind.

This rather lengthy rendition clearly supports appellee's position that Chief Deputy Bill Grounds' injury resulted from Sheriff Corley's failure to keep his word by returning to the office to advise Chief Deputy Bill Grounds regarding grand jury proceedings. A review of all the evidence reveals that the trauma experienced by Chief Deputy Bill Grounds preceded his actual knowledge that he had in fact been indicted by the grand jury.

The trial court submitted the following instructions and questions to the jury:

If an employee voluntarily turns aside from the usual and customary tasks of his employment and participates in an illegal or unlawful act any injuries sustained as a result of such act is not in the course of employment.

An employee who is temporarily directed or instructed by his employer to perform services outside the usual course of trade, business, profession, or occupation of his employer is in the course of employment while performing services according to such direction or instructions, and any injuries sustained as a result of such services is in the course of employment.

"Repetitious mental trauma" means an injury which arises from a series of mental traumas instead of an undesigned, unexpected event, traceable to a definite time, place and cause.

Considering these instructions the jury was asked the following questions:

1) Did Billy Joe Grounds, on or about December 7, 1988 or December 8, 1988, receive an injury as a result of mental trauma in the course of his employment that was a producing cause of his death? [If the jury answered question number one (1) yes, then the jury was to answer question number two (2).]

2) Was the injury the result of repetitious mental trauma?

The jury answered "Yes" to question 1) and "No" to question 2).

No objection is lodged in this appeal by either appellant or appellee regarding either the instructions or the questions. Appellant contends that the trial court erred by entering judgment in favor of appellee because the evidence offered by appellee conclusively established that Chief Grounds died of a heart attack induced by a criminal indictment that was, in turn, based upon Chief Grounds' involvement in altering certain official documents. Appellant contends that such a chain of casual events cannot give rise to a compensable injury. If the evidence was conclusive, establishing the fact that Chief Deputy Grounds voluntarily turned aside from the usual and customary task of his employment and participated in an illegal or unlawful act, then this Court would agree with appellant's position. The evidence in this civil trial does not conclusively establish that Chief Grounds was involved in any illegal or unlawful conduct. At best, the evidence shows that Chief Grounds was merely present when Sheriff Corley gave orders to take care of the Dehart matter.

This Court must determine whether or not the heart attack and resulting death of Bill

Grounds is compensable under the Texas Workers' Compensation Act. At the conclusion of this juried proceeding, Montgomery County filed its motion for judgment non obstante veredicto or in the alternative, motion for new trial. The trial court denied appellant's motion. Appellant's five points of error are directed to the trial court's ruling in this regard. Each of appellant's five points of error attack the legal and/or factual sufficiency of the evidence. Appellant's point of error two contends that the evidence in support of the jury's answer to question number one was factually insufficient, or the answer was so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. We shall address all five points of error pursuant to the same argument form set forth by appellant.

■ We begin by agreeing with appellee that the evidence clearly establishes the time, place and manifestation of symptoms relating to the onset of Chief Grounds' heart attack. We certainly understand appellant's efforts in insisting to this Court, that the triggering event was the indictment itself. The evidence in the record establishes that the onset of heart attack symptoms preceded Bill Grounds' knowledge of the indictment itself. The jury was given optional evidence whereby jurors could reasonably deliberate that the indictment itself was not the producing cause of mental shock or emotional trauma. The jury chose to believe that Chief Grounds suffered an injury and ultimate heart attack due to mental shock and emotional trauma which was traceable to a definite time, place and event preceding the disclosure of the indictment to the deceased. The jury did exactly that which factfinders are not only allowed to do, but are required to do, i.e., reach a conclusion based on all of the facts presented. The jury simply did not buy Montgomery County's argument that the indictment was the producing cause of Chief Grounds' injuries. We hold appellants' argument that public policy prevents recovery because the indictment was the producing cause of death of Chief Grounds to be without merit in this case.

Evidence showed that Chief Grounds was justifiably distraught, shocked and trauma-

tized when he was advised and realized that his boss, Sheriff Corley, would not be returning to work on December 7, 1988, to assure Chief Grounds that all was well. It was a proper function of the jury to conclude from the evidence that Chief Grounds had been the victim of misrepresentation by not only Sheriff Corley, but also the district attorney's office. Evidence in the record supports this because an assistant district attorney previously informed Chief Grounds that "he had nothing to worry about." From the evidence, the jury could conclude that the failure of Sheriff Corley to return to the office was viewed by Chief Grounds as a failure and refusal on the part of the Sheriff to back him up, that the Sheriff had not leveled with the district attorney nor the grand jury, and that Chief Grounds was "facing the heat" for the Sheriff, one final time. The jury could conclude from the evidence that the Sheriff's failure to return as promised to assure Chief Grounds, amounted to an abandonment and betrayal of the Chief for political or other reasons. The jury could conclude that Chief Grounds' injuries resulted from system victimization. Question: Does the Workers' Compensation Act allow recovery for injuries or death resulting from political interplay? The record speaks of only three indictments handed down by the Montgomery County Grand Jury. These indictments were directed to subordinates of Sheriff Corley. From the record one could easily conclude that Sheriff Corley, the person responsible for record alteration, was not indicted for the offense set in motion at his direction. Evidence reveals that Sheriff Corley, an elected official, was in communication with the Montgomery County District Attorney's Office regarding possible indictments relating to alteration of the Dehart report. Evidence in the record would support the jury's conclusion or circumstantial assumption, that Chief Grounds became a political scapegoat.

It is certainly not the function nor prerogative of this Appellate Court to subjectively scrutinize evidence presented to the Montgomery County Grand Jury, which resulted in an indictment against Chief Deputy Bill Grounds. No doubt that much of the evidence submitted to the Montgomery County

Grand Jury was also admitted during this lengthy civil trial. We simply observe that in this civil proceeding, evidence is scant as to any wrongdoing on the part of Chief Deputy Bill Grounds. It is, however, the function and prerogative of this Court to determine if there was sufficient evidence presented to this civil jury for a determination of those questions presented, guided by proper instructions, which would allow that jury to conclude that Chief Grounds suffered a compensable injury while acting within the course and scope of his employment.

■ We hold that the evidence was sufficient to show that on or about December 7, 1988, Chief Bill Grounds received an injury as a result of mental trauma while in the course of his employment, said injury being a producing cause of his death. We pay little heed to appellant's argument that Chief Grounds died at home on December 14, 1988. The law in Texas is settled that in heart attack cases, compensation benefits are due when a heart attack results from mental or emotional stress traceable to a definite time, place and event. *Transportation Ins. Co. v. Maksyn*, 580 S.W.2d 334, 338 (Tex.1979); *Texas Employers' Ins. Ass'n. v. Courtney*, 709 S.W.2d 382, 384 (Tex.App.—El Paso 1986, writ ref'd n.r.e.).

Although the case before this Court represents a factual novelty in workers' compensation law, we are not without case law guidance, which would allow recovery under our facts. Interestingly similar is the case of *Dir., State Employees Workers' Compensation Div. v. Camarata*, 768 S.W.2d 427, 429 (Tex.App.—El Paso 1989, no writ). *Camarata* was a workers' compensation case wherein a jury returned a verdict finding that appellee suffered temporary total incapacity as a result of an injury received in the course and scope of his employment. Appellee, Thomas A. Camarata, age fifty, had been employed as an auditor for the Texas Department of Human Services for over ten years when he was fired. Before September 30, 1985, his evaluation ratings always met requirements or exceeded requirements of the agency. Before the accident date, *Camarata* had serious problems with a supervisor, which resulted in the filing of complaints with the Equal Employment Opportunities Commission and the Texas Commission on Human Rights. In 1979, appellee was seen by a urologist, who treated him for a variety of hormone problems. Appellee had also seen a psychologist because he was suffering from tension as a result of his feeling that he had been treated unfairly on the job. The jury determined that *Camarata* had received an injury and that such injury occurred in the course and scope of his employment. Appellant complained on appeal that the trial court erred in failing to grant appellant's motion for new trial because there was insufficient evidence of probative force to support the jury's finding that an injury occurred in the course and scope of employment with the Texas Department of Human Services. The El Paso Court of Appeals determined that, "[w]hen considering factual insufficiency evidence challenges, we must consider all of the evidence in the record and after doing so we may only set aside the jury verdict if it is contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." Citing *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175 (Tex.1986). The El Paso court determined that the crux of the case centered upon a memorandum received by appellee's supervisor. The memo was in reference to appellee, *Camarata*, and was shown to him. The memorandum read as follows:

> These four [desk audit] problems constitute a 44 percent rejection rate from this batch of Tom's [Appellee's] work. This type of work cannot be tolerated, especially in light of the time your office is taking to complete the task.
>
> I have corrected two of the reports and am returning two for proper completion. In the past I have sent rejections to the auditor in question (Appellee); however, I have seen no improvement and will route them through you from now on.
>
> If you auditors are having trouble with the desk audits that you cannot solve, please contact me and we will try to work something out.

*Camarata* contended that the showing of this memo resulted in the injury suffered by him and that it occurred while in the course

and scope of his employment. Appellee testified that the memo was unfairly directed at him, was also inaccurate and resulted in devastation to him. It was so upsetting that he struck his fist against some computer printout paper. In upholding the jury's verdict, the El Paso court determined that mental trauma can produce an accidental injury so long as there is proof of a definite time, place and cause, citing *Maksyn*. Further, that medical testimony as well as appellee's testimony was sufficient to trace appellee's problem to a particular event, i.e., the memo shown to appellee on September 30, 1985, and therefore supported the submission of the issue and the finding of the jury.

■ Unfortunately, but quite obviously, Chief Grounds never had the opportunity to defend himself against the indictment handed down by the Montgomery County Grand Jury. When Sheriff Corley did not return to the office, as promised, to let Chief Grounds know that he had nothing to worry about, the Chief realized at that moment, that his instructions not to worry had indeed become misrepresentations. We have previously set forth the detailed testimony regarding Chief Grounds' reaction to Sheriff Corley's failure to return to the office as promised. The evidence is clear that an injury resulted to Chief Grounds at a definite time, at a definite place and was caused by a definite event. The fact that Chief Grounds died several days later, while at home does not prevent recovery under the Workers' Compensation Act. Fatal heart attacks occurring at home or even days or months later following an injury directly traceable to a time, place, and cause, is recoverable in this State. Our Texas Supreme Court has determined that the clear purpose of the Workers' Compensation Act is to provide compensation benefits to employees whose injuries have to do with and originate in the work, business, trade, or profession of the employer. *Lujan v. Houston General Ins. Co.*, 756 S.W.2d 295, 297 (Tex.1988).

■ Historically, the Workers' Compensation Act has demanded liberal construction in favor of the worker. Courts have been warned that the provisions of the Act "should not be hedged about with strict construction, but should be given a liberal construction to carry out its evident purpose." *Yeldell v. Holiday Hills Retirement & Nursing*, 701 S.W.2d 243, 245 (Tex.1985); *See also, Stott v. Texas Employers Ins. Ass'n.*, 645 S.W.2d 778, 780 (Tex.1983).

Appellant asked this Court to hold as a matter of law that the indictment alone caused mental stress and trauma and that Chief Grounds was guilty as charged. This Court does not accept that argument nor did the jury below. The trial court instructed the jury, in its charge, regarding "illegal or unlawful acts." Here appellant had its strongest opportunity to convince the jury that Chief Grounds' injury resulted from illegal acts committed by him. It is apparent that the jury below became convinced that Chief Grounds did not voluntarily turn aside from the usual and customary task of his employment to participate in illegal or unlawful acts.

This Court finds no error in the trial court's denial of appellant's motion for judgment non obstante veredicto nor in its denial of appellant's motion for new trial. The evidence was sufficient to support the jury's answer to question No. 1.

■ Appellant proffered, and the trial court submitted jury question No. 2, which related to repetitious mental trauma. Appellant now complains that the jury's answer to question No. 2, was factually insufficient or that their answer was so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. Appellant's brief, however, fails to inform this Court as to a basis for its contention. In considering "great weight" and "factual sufficiency" points of error, this Court must consider all the evidence including that which is contrary to the verdict. We may sustain a factual insufficiency point only if we determine that findings of material fact are so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *INA of Texas v. Adams*, 793 S.W.2d 265, 266 (Tex.App.–Beaumont 1990, no writ). When considering "great weight" points of error, which complain of a jury's failure to find

facts, this Court may not reverse merely because we disagree with the jury's verdict or conclude that the evidence preponderates toward an affirmative answer. A reversal is only justified when a thorough review of the evidence indicates that the great weight of the evidence supports an affirmative answer. *Herbert v. Herbert* 754 S.W.2d 141, 144 (Tex. 1988).

In the case before us, we shall not substitute our judgment for that of the jury if the challenged findings are supported by some evidence of probative value and not against the great weight and preponderance of the evidence. *Texas Employers' Ins. Ass'n. v. Jackson,* 719 S.W.2d 245, 250 (Tex.App.—El Paso 1986, writ ref'd n.r.e.); *Alford, Meroney & Co. v. Rowe,* 619 S.W.2d 210, 213 (Tex.Civ. App.—Amarillo 1981, writ ref'd n.r.e.).

There existed substantial evidence that Bill Grounds' heart attack was produced by mental trauma in the course of employment and that the heart attack was not the result of repetitious trauma. We perceive that the burden was on appellant to establish repetitious mental trauma, however, they failed to do so.

The jury heard much evidence during this long civil trial. The jury heard evidence that Bill Grounds was a good man, well loved and respected by those who knew him and those who worked with him. The jury heard evidence that Bill Grounds was a loyal law-abiding employee and public servant, that he did everything for his boss, Sheriff Corley, and that he "faced the heat" and covered for the Sheriff. The jury heard evidence that Bill Grounds was more than merely instrumental in the re-election of Sheriff Corley in 1987. Evidence revealed that Chief Deputy Bill Grounds virtually took "over the reins." for the Sheriff's campaign. According to an employee with the Montgomery County Sheriff's Department, Bill Grounds was:

> A very cheerful individual, ebullient most of the time, sole of patience. I can remember him dealing for hours with situations that I certainly never would have, just got along with everybody very well. I was told before he came to Montgomery County that he was a cop's cop, and never saw him do anything in the years that I knew

him that would cause me to believe any other way.

Tragedy, in its purest form, is best exemplified by and through the life of a good man, taken down in defeat by forces of such nature and magnitude that even he cannot compete. Tragedy of tragedies comes when defeat comes through and by that system which the man had devoted his life to protect and defend.

The record supports that Chief Bill Grounds dedicated his life to good, strong and honest law enforcement. The evidence is supportive of the conclusion that Bill Grounds was a faithful law enforcement officer whose death resulted from causes occurring while in the performance of his duties to his County, his State and his Nation.

We overrule appellant's points of error one through five and affirm the judgment of the trial court.

AFFIRMED.